IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

STATE OF OKLAHOMA,

Plaintiff-Appellee,

v.

MIGUEL CARDONA, in his official capacity as Secretary
of Education, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Western District of Oklahoma
No. CIV-24-00461-JD
Hon. Jodi W. Dishman

_____

**BRIEF FOR APPELLANTS**
_____

*Of Counsel:*

LISA BROWN
*General Counsel*
*U.S. Department of Education*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

MELISSA N. PATTERSON
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1673*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

STATEMENT OF JURISDICTION .................................................................3

STATEMENT OF THE ISSUE.........................................................................4

STATEMENT OF THE CASE ..........................................................................4

      A.     Title IX and the Rule..........................................................................4

      B.     Prior Proceedings.................................................................................7

            1.     District Court Proceedings .................................................7

            2.     Related Proceedings.............................................................9

SUMMARY OF ARGUMENT........................................................................ 10

STANDARD OF REVIEW ............................................................................. 16

ARGUMENT .................................................................................................... 16

I.     Plaintiff Is Unlikely to Prevail on the Merits of Its Challenges............................ 16

      A.     Gender-Identity Discrimination Necessarily Entails Discrimination on the Basis of Sex................................................16

      B.     The Rule's Treatment of Sex-Separate Spaces Effectuates Title IX's Text.....................................................................................24

      C.     The Rule's Prohibition on Hostile-Environment Harassment Raises No First Amendment Concerns........................................27

II.    The Remaining Factors Weigh Against Preliminary Injunctive Relief.............. 35

      A.     Plaintiff Failed to Establish Irreparable Harm. ...........................35

      B.     The Equities and Public Interest Weigh Against an Injunction. ..............38

III.    At a Minimum, the Injunction Is Overbroad..........................................................  38

CONCLUSION ..............................................................................................................  43

 STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

20 U.S.C. § 1681 ....................................................................................................A1

20 U.S.C. § 1682 ....................................................................................................A4

Order (July 31, 2024), ECF No. 48 ....................................................................A5

# TABLE OF AUTHORITIES

**Cases:**                                                                                                  **Page(s)**

*A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*,
    75 F.4th 760 (7th Cir. 2023) ................................................................. 19, 26

*Azar v. Allina Health Servs.*,
    139 S. Ct. 1804 (2019) ................................................................................. 22

*Bostock v. Clayton County*,
    590 U.S. 644 (2020) ....................... 2, 5, 6, 11, 17, 18, 19, 20, 21, 22, 23, 42

*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006) ....................................................................................... 24

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ..................................................................................... 39

*Cannon v. University of Chi.*,
    441 U.S. 677 (1979) ..................................................................................... 38

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999) ................................................. 8, 14, 30, 30-31, 31

*Department of Educ. v. Louisiana*,
    603 U.S. 866 (2024) ................................................... 10, 17, 18, 42, 43

*Doe v. University of Denver*,
    952 F.3d 1182 (10th Cir. 2020) ................................................................. 19

*Dunn v. Commodity Futures Trading Comm'n*,
    519 U.S. 465 (1997) ..................................................................................... 22

*First W. Capital Mgmt. Co. v. Malamed*,
    874 F.3d 1136 (10th Cir. 2017) ................................................................. 35

*Florida v. Department of Health & Human Servs.*,
    19 F.4th 1271 (11th Cir. 2021) ........................................................... 15, 36

*Fowler v. Stitt*,
    104 F.4th 770 (10th Cir. 2024) ................................................ 2, 11, 17, 20

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998) ............................................................................. 30, 31

*Gill v. Whitford,*
  585 U.S. 48 (2018) ................................................................. 16

*Grabowski v. Arizona Bd. of Regents,*
  69 F.4th 1110 (9th Cir. 2023) ................................................ 19

*Grimm v. Gloucester Cty. Sch. Bd.,*
  972 F.3d 586 (4th Cir.), *as amended* (Aug. 28, 2020) ............ 19, 26

*Gross v. FBL Fin. Servs., Inc.,*
  557 U.S. 167 (2009) .............................................................. 22

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) .............................................................. 37

*Harmon v. City of Norman,*
  61 F.4th 779 (10th Cir. 2023) ............................................ 32, 33

*Harris v. Forklift Sys., Inc.,*
  510 U.S. 17 (1993) ............................................................ 28, 29

*Heideman v. South Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) ...................................... 35-36, 42

*Initiative & Referendum Inst. v. Walker,*
  450 F.3d 1082 (10th Cir. 2006) (en banc) ............................. 37

*Jackson v. Birmingham Bd. of Educ.,*
  544 U.S. 167 (2005) .......................................... 1, 2, 4, 22, 23, 27

*Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.,*
  69 F.4th 350 (6th Cir. 2023) ................................................ 34

*Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy,*
  594 U.S. 180 (2021) .............................................................. 34

*Maryland v. King,*
  567 U.S. 1301 (2012) ............................................................ 38

*Members of the City Council of the City of L.A. v. Taxpayers for Vincent,*
  466 U.S. 789 (1984) .............................................................. 33

*Muldrow v. City of St. Louis,*
  601 U.S. 345 (2024) .............................................................. 24

*New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior,*
854 F.3d 1236 (10th Cir. 2017) ............................................. 16, 36

*New York v. U.S. Dep't of Educ.,*
477 F. Supp. 3d 279 (S.D.N.Y. 2020) ................................ 37

*Pennsylvania v. DeVos,*
480 F. Supp. 3d 47 (D.D.C. 2020) ..................................... 37

*Prairie Band of Potawatomi Indians v. Pierce,*
253 F.3d 1234 (10th Cir. 2001) .......................................... 37

*Rowles v. Curators of the Univ. of Mo.,*
983 F.3d 345 (8th Cir. 2020) ......................................... 32-33, 34

*Throupe v. University of Denver,*
988 F.3d 1243 (10th Cir. 2021) .......................................... 29

*Ward v. Utah,*
398 F.3d 1239 (10th Cir. 2005) ...................................... 32, 33

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ............................................................ 35, 38

## Statutes:

Education Amendments of 1974,
Pub. L. No. 93-380, tit. VIII, pt. D, § 844, 88 Stat. 484, 612 .....................................25

Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e-2(a)(1) ............................................. 5, 18

5 U.S.C. § 702 ................................................................. 3

5 U.S.C. §§ 705-706 ......................................................... 3

20 U.S.C. § 1234g(a) ........................................................ 5

20 U.S.C. § 1681(a) ..................................... 4, 16, 19, 22, 24, 41

20 U.S.C. § 1681(a)(6) ..................................................... 6

20 U.S.C. § 1681(a)(6)(A) ............................................... 24

20 U.S.C. § 1681(a)(6)(B) ............................................... 24

20 U.S.C. § 1682 ............................................................................................ 4

20 U.S.C. §§ 1682-1683 ................................................................................ 5

20 U.S.C. § 1686 ...................................................................................... 6, 24

28 U.S.C. § 1292(a)(1) .................................................................................. 3

28 U.S.C. § 1331 ........................................................................................... 3

28 U.S.C. § 1346 ........................................................................................... 3

28 U.S.C. § 1683 ........................................................................................... 3

28 U.S.C. § 2201(a) ...................................................................................... 3

**Regulatory Materials:**

34 C.F.R. § 100.7(a)-(d) .............................................................................. 5

34 C.F.R. § 100.8(a) ..................................................................................... 5

34 C.F.R. § 106.2 ........................................................................ 2, 7, 28, 39

34 C.F.R. § 106.8(a) ..................................................................................... 5

34 C.F.R. § 106.8(a) (2020) ...................................................................... 41

34 C.F.R. § 106.8(c) ..................................................................................... 5

34 C.F.R. § 106.8(c) (2020) ...................................................................... 41

34 C.F.R. § 106.8(d) (2020) ...................................................................... 41

34 C.F.R. § 106.8(f) ...................................................................................... 5

34 C.F.R. § 106.9 ........................................................................................ 40

34 C.F.R. § 106.10 ............................................................................. 1, 6, 16

34 C.F.R. § 106.16 ...................................................................................... 40

34 C.F.R. § 106.30(a)(2) (2020) .............................................................. 28

34 C.F.R. § 106.31(a)(2) ................................................................ 1, 6, 21, 25

34 C.F.R. § 106.33 ........................................................................ 25

34 C.F.R. § 106.40(b) ................................................................... 39

34 C.F.R. § 106.40(b)(3)(v) ........................................................... 5

34 C.F.R. § 106.44 ........................................................................ 5

34 C.F.R. § 106.44(j)(2) ............................................................... 39

34 C.F.R. §§ 106.45-106.46 ..................................................... 5, 39

34 C.F.R. § 106.48 ..................................................................... 40

34 C.F.R. § 106.57(e)(2) ............................................................... 5

34 C.F.R. § 106.71 ..................................................................... 39

34 C.F.R. § 106.71(a) (2020) ....................................................... 41

45 C.F.R. § 86.1 (1975) .............................................................. 41

45 C.F.R. § 86.3(a)-(b) (1975) ..................................................... 41

45 C.F.R. § 86.4 (1975) .............................................................. 41

45 C.F.R. § 86.6(a) (1975) .......................................................... 41

45 C.F.R. § 86.9(a) (1975) .......................................................... 41

45 C.F.R. § 86.9(c) (1975) .......................................................... 41

45 C.F.R. § 86.36(a)-(c) (1975) ................................................... 41

45 C.F.R. § 86.37(a)(2) (1975) .................................................... 41

45 C.F.R. § 86.37(b) (1975) ........................................................ 41

45 C.F.R. § 86.38(a) (1975) ........................................................ 41

45 C.F.R. § 86.39 (1975) ............................................................ 41

45 C.F.R. § 86.51(a)(4) (1975) .................................................... 41

45 C.F.R. § 86.53 (1975) ............................................................ 41

45 C.F.R. § 86.56(b) (1975) ............................................................ 41

45 C.F.R. § 86.59 (1975) ............................................................... 41

Exec. Order No. 14,021, § 2(a),
    86 Fed. Reg. 13,803 (Mar. 11, 2021) ............................................ 5

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ............................................................. 3

**Other Authorities:**

62 Fed. Reg. 12,034 (Mar. 13, 1997) ............................................... 31

*Nondiscrimination on the Basis of Sex in Education Programs or Activities*
    *Receiving Federal Financial Assistance,*
    85 Fed. Reg. 30,026 (May 19, 2020) ............................................ 5

*Nondiscrimination on the Basis of Sex in Education Programs or Activities*
    *Receiving Federal Financial Assistance,*
    89 Fed. Reg. 33,474 (Apr. 29, 2024) ...................... 1, 6, 7, 15, 16-17, 20, 23, 24, 25,
                                        26, 27, 28, 29, 30, 32, 33, 34, 35, 39, 40

*Revised Sexual Harassment Guidance: Harassment of Students by School*
    *Employees, Other Students, or Third Parties,*
    66 Fed. Reg. 5512 (Jan. 19, 2001) ............................................... 28

## RULE 28.2(C)(3) STATEMENT

There have been no prior or related appeals in this case.  Several other challenges to the same rulemaking are pending in cases around the country, including in this Court.  *See Kansas v. U.S. Dep't of Educ.*, No. 24-3097 (10th Cir.).

## GLOSSARY

| | |
|---|---|
| Department | U.S. Department of Education |
| Rule | *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) |
| Title IX | Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235, 304-311 |

## INTRODUCTION

Title IX prohibits sex discrimination in federally funded education programs and activities. As the Supreme Court has made clear, "Congress gave the statute a broad reach" to cover a "wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Congress also authorized the Department of Education to issue rules to effectuate the statute's sweeping prohibition on sex discrimination.

In April 2024, the Department exercised that delegated authority by issuing a rule that makes a variety of amendments to its Title IX regulations. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (Rule). The Rule does many things, ranging from revising recordkeeping requirements to guaranteeing access to lactation spaces for breastfeeding students. Only three provisions of the Rule are challenged here—and in particular, those provisions are at issue only insofar as they apply to discrimination on the basis of gender identity.

The first provision (34 C.F.R. § 106.10) clarifies that discrimination on the basis of gender identity is necessarily discrimination on the basis of sex. The second (34 C.F.R. § 106.31(a)(2)) provides that schools violate Title IX when they differentiate on the basis of sex in a way that causes a person more than de minimis harm and when that differentiation lacks a statutory basis; as relevant here, it means that individuals must be permitted to use restrooms consistent with their gender identity. And the

third (34 C.F.R. § 106.2's definition of hostile-environment harassment) recognizes that unwelcome sex-based conduct that is "subjectively and objectively offensive" and "so severe or pervasive that it limits or denies" a person's ability to benefit from an educational program constitutes hostile-environment harassment. All three provisions effectuate Title IX's "broad" prohibition on sex discrimination, *Jackson*, 544 U.S. at 175, and all three are consistent with precedent of this Court and the Supreme Court.

Plaintiff's challenge to these provisions is meritless. Section 106.10 flows directly from the plain text of Title IX and the reasoning of the Supreme Court's decision in *Bostock v. Clayton County*, which recognizes that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 590 U.S. 644, 660 (2020). As this Court has explained, *Bostock*'s essential insight "concerning the intertwined nature of transgender status and sex" is not confined to Title VII. *Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024). Section 106.31(a)(2) likewise follows directly from the statutory text: Unless the statute provides otherwise, it violates Title IX's general nondiscrimination mandate to treat a person differently on the basis of sex when that differential treatment causes more than de minimis harm. And § 106.2's definition of hostile-environment harassment, which requires recipients to address conduct that limits or denies students the right to an education free from sex discrimination, is

consistent with the standards that courts—including this one—have long applied in both the Title IX and Title VII contexts.

The district court nevertheless entered a sweeping preliminary injunction barring the Department from enforcing the entirety of the Rule in Oklahoma. In so holding, the court erred in refusing to apply *Bostock*'s central teaching—*i.e.*, discrimination on the basis of gender identity is necessarily discrimination on the basis of sex—to the materially indistinguishable language of Title IX. Beyond that, the court erroneously found that plaintiff satisfied its burden of establishing irreparable harm sufficient to warrant preliminary relief. And the court failed to justify an injunction against the entirety of the Rule when it found plaintiff likely to prevail in showing only three discrete provisions to be unlawful.

This Court should vacate the preliminary injunction or, at a minimum, substantially narrow it.

## STATEMENT OF JURISDICTION

Plaintiff asserted jurisdiction under 28 U.S.C. §§ 1331 and 1346, as well as 5 U.S.C. §§ 702, 705-706 and 28 U.S.C. §§ 1683, 2201(a). Appx.013-014.[1] The district court entered a preliminary injunction on July 31, 2024. Appx.203. Defendants timely appealed on September 27, 2024. Appx.204; Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

---

[1] Citations to "Appx.XXX" refer to the page numbers of the one-volume appendix filed with this brief.

## STATEMENT OF THE ISSUE

In April 2024, the Department of Education issued a rule making numerous changes to its regulations implementing Title IX of the Education Amendments of 1972. After finding that plaintiff was likely to succeed on its challenges to three of the new or changed provisions, the district court preliminarily enjoined the Department from enforcing the entire Rule within Oklahoma. The question presented is whether the district court erred in entering the preliminary injunction.

## STATEMENT OF THE CASE

### A.    Title IX and the Rule

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Congress gave the statute['s]" prohibition on sex discrimination "a broad reach" subject only to a "list of narrow" statutory exceptions and exclusions. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 175 (2005); *see* 20 U.S.C. §§ 1681(a), 1686. Congress also authorized the Department to "issu[e] rules, regulations, or orders of general applicability … consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682. And Congress established a detailed administrative enforcement scheme requiring the Department to first attempt to secure compliance through voluntary means before it may suspend or terminate

federal financial assistance.  *See id.* §§ 1234g(a), 1682-1683; *see also* 34 C.F.R. §§ 100.7(a)-(d), 100.8(a).

Since Title IX's enactment, the Department has promulgated regulations implementing the statute's prohibition on sex discrimination, including in 2020.  *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).  One month after publication of the 2020 rule, the Supreme Court held that the prohibition on discrimination "because of … sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation and gender identity.  *See Bostock v. Clayton County*, 590 U.S. 644, 660 (2020).  Following *Bostock*, the President directed the Department to review the 2020 rule and existing guidance "for consistency with governing law."  Exec. Order No. 14,021, § 2(a), 86 Fed. Reg. 13,803, 13,803 (Mar. 11, 2021).

After an extensive public engagement process, the Department issued the Rule. Among other things, the Rule streamlines requirements related to Title IX Coordinators, 34 C.F.R. § 106.8(a); revises recipients' notice of nondiscrimination and record-keeping requirements, *id.* § 106.8(c), (f); ensures access to lactation spaces for breastfeeding students and employees, *id.* §§ 106.40(b)(3)(v), 106.57(e)(2); addresses a recipient's response to sex discrimination, *id.* § 106.44; and provides recipients additional flexibility regarding procedures to respond to claims of sex discrimination, including sex-based harassment, *id.* §§ 106.45-106.46.

The district court's preliminary-injunction decision concerns other provisions of the Rule. Section 106.10 describes the scope of prohibited sex discrimination under Title IX. It provides that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 34 C.F.R. § 106.10. As the Department explained, "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

Separately, § 106.31(a)(2) details when separation or differentiation on the basis of sex constitutes prohibited sex discrimination. It sets out the general principle that Title IX bars "different treatment or separation on the basis of sex" when such differential treatment or separation "discriminates … by subjecting a person to more than de minimis harm." 34 C.F.R. § 106.31(a)(2). Section 106.31(a)(2) further provides that a policy or practice that "prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." *Id.* The provision recognizes, however, that Congress carved out certain contexts in which a school may permissibly differentiate on the basis of sex even though more than de minimis harm may result. *Id.*; *see, e.g.*, 20 U.S.C. § 1681(a)(6) (membership in fraternities or sororities); *id.* § 1686 (maintenance of sex-separate living facilities).

Finally, § 106.2 defines many terms, including "sex-based harassment." 34 C.F.R. § 106.2. One form of such harassment is "[h]ostile environment harassment," defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." *Id.* Section 106.2 explains that "[w]hether a hostile environment has been created is a fact-specific inquiry that includes consideration" of several enumerated factors. *Id.*

Nothing in the Rule alters the existing regulation regarding sex-separate athletic teams, which is the subject of a separate rulemaking. *See* 89 Fed. Reg. at 33,817.

## B.     Prior Proceedings

### 1.     District Court Proceedings

Plaintiff is the state of Oklahoma, which challenged the Rule's treatment of gender-identity discrimination and sought preliminary injunctive relief. *See* Appx.011 (asserting that the Rule creates an "unprecedented gender-identity mandate"); Appx.061 (seeking an injunction barring the entire Rule from going into effect). In July 2024, the district court entered a preliminary injunction barring enforcement of the Rule within the state. Appx.203.

The court held that § 106.10's inclusion of gender-identity discrimination in the scope of prohibited sex discrimination contravened Title IX, reasoning that the Rule "expand[s] 'sex' in Title IX to include 'gender identity,'" Appx.188, and thus erodes

Title IX's purpose by "elevat[ing] gender identity and its accompanying protections above that of biological sex," Appx.185. The court rejected the Department's reliance on *Bostock*, stating that "the Court is not convinced that *Bostock* stands for the proposition that sex discrimination occurs anytime someone is treated differently based on their gender identity." Appx.185. And the court declined to "apply *Fowler*'s analysis to Title IX," opining that "nothing in *Fowler* suggests it applies outside the Equal Protection context." Appx.187. For similar reasons, the court concluded that the major-questions doctrine and the Spending Clause required clearer congressional authorization for the Rule. Appx.187-189, Appx.192-193.

The court also held that § 106.31(a)(2)'s de minimis harm standard was arbitrary and capricious. The court concluded that the application of that standard to sex-separate restrooms and locker rooms "undercuts Title IX's purpose, epitomizes a clear error in judgment, and entirely fails to consider important aspects of the problem the Department sought to resolve." Appx.196.

Separately, the court held that § 106.2's definition of hostile-environment harassment contravened the First Amendment. Appx.189. The court concluded that the standard improperly "strayed" from the standard for judicially implied damages actions announced in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). Appx.190. The court also concluded that the Department defined the hostile-environment standard in "vague terminology" and that the standard was

overbroad for reaching conduct "outside the classroom and off campus." Appx.190, Appx. 192.[2]

As to the remaining injunction factors, the court determined that the equities favored plaintiff. Appx.199-200. The court further concluded that plaintiff faced irreparable harm in the form of compliance costs, the violation of First Amendment rights, and the infringement of its sovereign interests. Appx.198-199.

Regarding the injunction's scope, the court recognized that plaintiff challenged only certain provisions of the Rule and that those provisions were covered by severability clauses. Appx.201. But the court declined to limit the injunction to the challenged provisions or to the application of the Rule to gender-identity discrimination that the court deemed invalid. Instead, the court enjoined the Rule in its entirety within Oklahoma. Appx.201.

## 2. Related Proceedings

Other challenges to the Rule are pending in cases around the country. In two such cases, the Department asked the Supreme Court to partially stay preliminary injunctions pending appeal.[3] The Supreme Court denied the applications, reasoning that "[i]n this emergency posture in this Court, the burden is on the Government as

---

[2] The court rejected plaintiff's arguments concerning athletics, explaining that the current regulations on athletics continue to apply. Appx.197.

[3] The Department also filed an emergency motion in this Court seeking to partially stay a preliminary injunction in another challenge to the Rule. *See* Emergency Mot. for Partial Stay Pending Appeal, *Kansas v. U.S. Dep't of Educ.*, No. 24-307 (10th Cir. July 16, 2024). As of this filing, that application remains pending.

applicant" to show entitlement to relief and that "[o]n this limited record and in its emergency applications, the Government has not provided this Court a sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule." *Department of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024). The Court also stated that it "today accept[ed] that the plaintiffs" in the related proceedings "were entitled to preliminary injunctive relief as to [the] three provisions of the rule" challenged by plaintiffs, noting that the dispute before the Court involved whether "other provisions of the new rule should still be permitted to take effect in the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals." *Id.* at 867. Justice Sotomayor—joined by Justices Kagan, Gorsuch, and Jackson—dissented, explaining that the "injunctions are overbroad" because they "bar the Government from enforcing the entire rule—including provisions that bear no apparent relationship to [the plaintiffs'] alleged injuries." *Id.* at 869 (Sotomayor, J., dissenting in part).

## SUMMARY OF ARGUMENT

**I.** The district court erred in holding that the challenged Rule provisions—and, in particular, their application to certain contexts involving gender-identity discrimination—were likely unlawful.

**A.** The Rule provision addressing the scope of prohibited sex discrimination (§ 106.10) properly recognizes that gender-identity discrimination is

necessarily sex discrimination. That conclusion follows directly from the statute's plain text and from the reasoning of *Bostock v. Clayton County*, 590 U.S. 644 (2020), which interpreted materially identical language in Title VII and concluded that gender-identity discrimination necessarily involves sex discrimination. That is so, as *Bostock* made clear, even assuming that "sex" is understood to refer only to physiological or "biological distinctions between male and female." *Id.* at 655.

None of the district court's reasons for distinguishing *Bostock* withstand scrutiny. As this Court recently recognized, *Bostock*'s logic "concerning the intertwined nature of transgender status and sex" is not confined to Title VII. *Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024). Instead, *Bostock*'s logic applies with equal force to the Title IX context. This Court and others assess claims arising under Title VII and Title IX under the same legal analysis because the statutes serve the same purpose of eradicating sex discrimination and impose the same causation standards. The district court ran afoul of basic rules of statutory interpretation by relying on nebulous, atextual considerations like the court's sense of Title IX's history and purposes to conclude that "sex discrimination" carries different meanings in materially identical statutory text.

For largely the same reasons, the district court was wrong to conclude that the Rule likely violates the major-questions doctrine and the Spending Clause. Both holdings turned on the district court's erroneous conclusion that the Rule rewrites Title IX's definition of sex discrimination. But as the Supreme Court made clear in

*Bostock*, the conclusion that gender-identity discrimination necessarily entails sex discrimination flows clearly from the statutory text. Because Title IX itself unambiguously prohibits discrimination on the basis of gender identity, clear-statement principles premised on the major-questions doctrine and Spending Clause have no application to the Rule.

**B.** Section 106.31(a)(2) sets out the circumstances in which drawing sex-based distinctions constitutes prohibited discrimination. Title IX does not prohibit all sex-based distinctions; rather, it bars only those distinctions that cause cognizable—*i.e.*, more than de minimis—harm. At the same time, Congress identified certain contexts, such as fraternity membership and the maintenance of living facilities, in which recipients may draw potentially harmful sex-based distinctions notwithstanding Title IX's prohibition on sex discrimination. Section 106.31(a)(2) thus effectuates Title IX's text and structure by providing that, unless a statutory basis for the exclusion applies, a recipient may not separate or differentiate on the basis of sex in a manner that subjects a person to more than de minimis harm.

The Rule also details how § 106.31(a)(2)'s de minimis harm standard applies to gender-identity discrimination. The Rule explains that preventing individuals from accessing sex-separate facilities and activities consistent with their gender identity subjects individuals to cognizable harm. Recipients thus must permit individuals to access sex-separate facilities and activities consistent with their gender identity, unless those facilities or activities fall within a congressionally recognized exception.

Applying those principles to restrooms, the separation of facilities by sex generally does not violate Title IX because a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom, and vice versa. But because restrooms are not exempt from Title IX's nondiscrimination mandate and denying individuals the ability to access sex-separate restrooms consistent with their gender identity causes cognizable harm, preventing transgender students from accessing restrooms that align with their gender identity would violate Title IX, as various courts have found.

The district court wrongly concluded that the de minimis harm standard's application to certain contexts involving sex separation (*e.g.*, restrooms) but not others (*e.g.*, living facilities) was arbitrary and capricious. Section 106.31(a)(2)'s application to restrooms reflects the deliberate choices that Congress itself made in exempting certain contexts from the nondiscrimination mandate; Congress provided no express exemption for sex-separate restrooms. The Rule neither conflicts with Title IX nor is unreasonable for carefully adhering to the statutory language that Congress actually enacted.

**C.**    The district court further erred in holding that § 106.2's definition of hostile-environment harassment contravenes the First Amendment. The standard announced in § 106.2 closely tracks the Department's longstanding interpretation of Title IX as well as the standard applied for evaluating hostile-environment harassment under Title VII. No court had previously found those standards in conflict with the

13

First Amendment; to the contrary, various courts—including this one—have upheld those proscriptions on hostile-environment harassment without raising any First Amendment concerns. And if any doubt remained, the Rule makes clear that no provision requires or authorizes a recipient to violate anyone's First Amendment rights when addressing sex-based harassment.

The district court erred in concluding that the Rule's hostile-environment standard is invalid because it departs in certain respects from the standard for judicially implied damages actions announced in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). In *Davis*, the Supreme Court addressed the "scope of liability in private damages actions" under Title IX's judicially implied right of action, *id.* at 641; it nowhere suggested that the standard for damages liability controls in the separate administrative-enforcement context. Indeed, the Court recognized that the standards may differ, distinguishing between "defin[ing] the scope of the behavior that Title IX proscribes" and determining what conduct "support[s] a private suit for money damages." *Id.* at 639.

The Rule's hostile-environment standard also is not overbroad or vague. The Rule defines the scope of prohibited harassment narrowly in terms of specific and required elements and in language with common usage in the nondiscrimination context. The Rule is not overbroad for recognizing that a school is obligated to address a hostile environment occurring "under its education program or activity, even when some conduct alleged to be contributing to the hostile environment

14

occurred outside" the program or activity. 89 Fed. Reg. at 33,530. Nor is the standard so indeterminate as to fail to put the public on notice of what is prohibited. Courts—including this one—have long applied analogous standards in both the Title VII and Title IX contexts without raising overbreadth or vagueness concerns, demonstrating that § 106.2's standard comports with the First Amendment.

**II.** The remaining preliminary-injunction factors favor the Department. Most importantly, plaintiff failed to establish irreparable harm. Although plaintiff complains that the Rule preempts conflicting state law, it is "black-letter law" that such preemption, standing alone, is not irreparable injury. *Florida v. Department of Health & Human Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021). Equally unavailing was the district court's abstract invocation of First Amendment rights, as plaintiff cannot assert the constitutional rights of its citizens and, in any event, identified no individual facing an objective and concrete threat of specific future harm. And the ordinary costs of complying with a federal regulation do not amount to irreparable harm, particularly where (as here) plaintiff made no showing that its costs were sufficiently unusual or extensive to justify the extraordinary remedy of a preliminary injunction. In contrast, the equities plainly favor the implementation of a regulation intended to fight sex discrimination in education.

**III.** Finally, the preliminary injunction was, at a minimum, overbroad. The district court found only three provisions of the Rule invalid, and even then, only their application to specific contexts involving gender-identity discrimination. The

Department's severability determinations make clear that the remaining provisions could and should take effect even if those three provisions were enjoined. The district court's expansive injunction vastly exceeded what was necessary to redress "the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

## STANDARD OF REVIEW

This Court reviews "the district court's decision to grant a preliminary injunction for abuse of discretion," with the "district court's factual findings" reviewed for "clear error and its conclusions of law de novo." *New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1245 (10th Cir. 2017) (quotation marks omitted).

## ARGUMENT

I.  **Plaintiff Is Unlikely to Prevail on the Merits of Its Challenges.**

A.  **Gender-Identity Discrimination Necessarily Entails Discrimination on the Basis of Sex.**

Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Section 106.10 describes the scope of that prohibition, explaining that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 34 C.F.R. § 106.10, "because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at

33,802 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020)).  Section 106.10 thus makes clear that Title IX's prohibition on sex discrimination covers actions like excluding a student from homecoming for being pregnant, giving a student detention for being gay, or barring a student from band "simply for being … transgender," *Bostock*, 590 U.S. at 651.

The district court's decision—mirroring plaintiff's challenge—focused on § 106.10's inclusion of gender identity.  *See* Appx.175; *see also* Appx.011.  On that score, the court rejected the Rule's recognition that the reasoning of *Bostock*, when applied to the text of Title IX, compels the conclusion that discrimination based on gender identity is necessarily discrimination "on the basis of sex."  *See* Appx.184.  But the reasons the district court gave for that conclusion have no foundation in the text of the statute and cannot be squared with the analysis in *Bostock* or this Court's decision in *Fowler v. Stitt*, 104 F.4th 770 (10th Cir. 2024).[4]

---

[4] In denying the Department's stay applications in the related actions, the Supreme Court did not address—or even mention—the applicability of *Bostock* to Title IX's text.  Nor did it otherwise resolve the merits of the Department's appeals from the preliminary injunctions.  The brief per curiam order merely noted that "all Members of the Court today accept[ed]" that the plaintiffs there were entitled to preliminary relief as to the challenged provisions, a statement describing only a stay-stage determination regarding the preliminary injunctions, as the dissent made clear.  *Department of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024) (per curiam); *see id.* at 869 (Sotomayor, J., dissenting in part) ("For now, on the briefing and record currently before us, I would stay the preliminary injunctions except as to the three [challenged] provisions.").  The Court's and dissent's analysis concerned only the separate question of whether "other provisions of the new rule should still be permitted to take effect in the interim period while the Government's appeals of the preliminary injunctions are

*Continued on next page.*

**1.** Section 106.10 reflects a straightforward application of *Bostock*'s reasoning. There, the Supreme Court confronted the provision of Title VII making it unlawful "for an employer … to discriminate against any individual … because of such individual's … sex." *Bostock*, 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656 (quotation marks omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity, the Court explained, "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660-61 (emphasis omitted). Such discrimination would, for example, "penalize[] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. That is true even on the assumption that "sex" in Title VII "refer[s] only to biological distinctions between male and female," *id.* at 655, and without having to decide how the insight applies to sex differentiation in contexts such as "bathrooms, locker rooms, and dress codes," *id.* at 681.

---

pending in the Courts of Appeals"—and again, addressed only whether the Department had satisfied its "burden … as applicant to show" in that "emergency posture" that it was entitled to a stay, without purporting to weigh in on the appeals that the Court noted were ongoing. *Id.* at 867; *see id.* at 869 (Sotomayor, J., dissenting in part).

*Bostock*'s reasoning applies with equal force to Title IX's prohibition against discrimination "on the basis of sex," 20 U.S.C. § 1681(a). Title IX imposes a causation standard no more stringent than but-for causation under Title VII. *See Doe v. University of Denver*, 952 F.3d 1182, 1196 (10th Cir. 2020) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims." (quotation marks omitted)). And as *Bostock* made clear, "sex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity. 590 U.S. at 661 (emphasis omitted). A school, no less than an employer, engages in sex discrimination when it "penalizes a person … for traits or actions that it tolerates" in persons identified as a different sex "at birth." *Id.* at 660. That is why various courts have concluded that in light of *Bostock*, discrimination on the basis of sexual orientation and gender identity are necessarily forms of prohibited sex discrimination under Title IX. *See, e.g.*, *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir.), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).

2.      None of the district court's various reasons for rejecting that conclusion are valid. The court emphasized that "at the time Title IX was enacted, 'sex' was defined by biology and reproductive functions." Appx.184 (some quotations marks omitted). But § 106.10 does not purport to adopt a different meaning of sex, as the court elsewhere appeared to recognize. *See* Appx.184. As the Department explained

19

at length, *see* 89 Fed. Reg. at 33,801-33,810, the Rule simply applies *Bostock*'s analysis to determine that discrimination on the basis of gender identity is necessarily discrimination on the basis of sex even assuming that "sex" refers only to physiological or "biological distinctions between male and female." *Bostock*, 590 U.S. at 655.

The district court dismissed the Rule's reliance on *Bostock* on the ground that the decision was limited to Title VII. Appx.184. But as this Court recently explained, nothing in *Bostock* "indicate[s] that its logic concerning the intertwined nature of transgender status and sex was confined to Title VII." *Fowler*, 104 F.4th at 790. Rather, the Supreme Court's focus "on Title VII and the issue before it suggests a proper exercise of judicial restraint, not a silent directive that its reasoning about the link between homosexual or transgender status and sex was restricted to Title VII." *Id.* (applying "*Bostock*'s commonsense reasoning … in the equal protection context"). The district court's suggestion that *Fowler* has no bearing on this case simply because the decision concerned the Equal Protection Clause, Appx.186, ignores this Court's conclusion that *Bostock*'s reasoning applies beyond Title VII claims. It also ignores that, if anything, *Bostock*'s reasoning has greater force in the Title IX context given the shared purpose and nearly identical language of Title VII and Title IX.

Similarly, the district court rejected the Rule's reasoning on the ground that the Supreme Court in *Bostock* did not purport to address sex separation in contexts like restrooms and locker rooms. Appx.185. But nothing in § 106.10 addresses sex

separation in those contexts either. Properly understood, § 106.10 answers only one question pertinent to this litigation: Where individuals are subject to discriminatory treatment because of their gender identity—such as by receiving detention "simply for being … transgender," *Bostock*, 590 U.S. at 651—is that discrimination "on the basis of sex" under Title IX? Reflecting the statute's plain text, and consistent with this Court's precedent, § 106.10 makes clear that the answer is yes. Punishing a student "for traits or actions" that a school "would not have questioned in members of a different sex" at birth is a decision in which "[s]ex plays a necessary and undisguisable role." *Id.* at 652. A separate provision of the Rule—*i.e.*, § 106.31(a)(2)—answers the related but distinct question of what constitutes discrimination when schools separate individuals on the basis of sex. *See infra* Part I.B. But § 106.10 deals only with what it means for discrimination to be "on the basis of sex." Its terms are a straightforward application of *Bostock*'s interpretation of materially identical statutory language.[5]

Indeed, the district court nowhere explained how Title VII's prohibition on discrimination "because of" sex means something different than Title IX's prohibition on discrimination "on the basis" of sex. In *Bostock* itself, the Supreme Court substituted the phrase "on the basis of" for Title VII's "because of" formulation at least eight times, demonstrating the commonsense understanding that the two phrases carry the same meaning. *See, e.g.*, 590 U.S. at 650 (noting that "in Title VII, Congress

---

[5] For much the same reason, the district court erred in concluding that "basing the Final Rule off *Bostock* does not reflect reasoned decision making." Appx.195-196.

outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin" (emphasis added)). Elsewhere, the Supreme Court has explained that the ordinary meaning of "the phrase 'based on' indicates a but-for causal relationship" and that the phrase has "the same meaning as the phrase, 'because of.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (quotation marks omitted).

Abandoning the statutory text and invoking legislative history, the district court suggested that recognizing that Title IX encompasses gender-identity discrimination would undermine the statute's "purpose" of addressing "discrimination *women* faced in education." Appx.185. But "legislative history is not the law," *Azar v. Allina Health Servs.,* 139 S. Ct. 1804, 1814 (2019). Rather, "the purposes underlying [a statute] are most properly fulfilled by giving effect to the plain meaning of the language as Congress enacted it." *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 474 (1997). The district court provided no textual basis for its suggestion that Title IX affords some people more protection than others—a suggestion that conflicts with Title IX's long history of affording men protection from sex-based discrimination. As enacted, Title IX "broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (quoting 20 U.S.C. § 1681(a)). That includes a guarantee that "[n]o person" should be subject to discrimination on the basis of sexual orientation and gender identity, 20 U.S.C. § 1681(a), which are "are inextricably bound up with sex," *Bostock*, 590 U.S. at 660-61.

**3.** Finally, the district court erred in concluding that the Rule is suspect under the Spending Clause and the major-questions doctrine. Appx.187-189, Appx.192-193. On both scores, the district court's holding stemmed from its erroneous conclusion that the Rule "expand[ed] 'sex' in Title IX to include 'gender identity.'" Appx.188. As already explained, discrimination on the basis of gender identity is necessarily sex discrimination covered by Title IX's text, even if sex "is understood to mean only physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655); *see supra* pp. 18-22. Because Title IX itself unambiguously prohibits discrimination on the basis of gender identity, clear-statement principles premised on the Spending Clause and the major-questions doctrine have no bearing on the scope of prohibited discrimination in § 106.10. The statute's "broadly written general prohibition on discrimination" places recipients of federal funds clearly on notice that they must comply with the prohibition on sex-based discrimination in all of its forms. *Jackson*, 544 U.S. at 175; *see id.* at 174-75 (holding that Title IX's private right of action encompasses retaliation claims even though the statute does not specifically mention retaliation). And just as the major-questions doctrine posed no obstacle to *Bostock*'s recognition that Title VII prohibits gender-identity discrimination, as the Equal Employment Opportunity Commission had already concluded, it poses no obstacle to recognizing that the Department has correctly interpreted the parallel text of Title IX.

## B. The Rule's Treatment of Sex-Separate Spaces Effectuates Title IX's Text.

**1.** Section 106.31(a)(2) is the provision detailing when otherwise permissible separation or differentiation on the basis of sex constitutes prohibited sex discrimination. It effectuates Title IX's plain text, which prohibits "discrimination" on the basis of sex. 20 U.S.C. § 1681(a). As the Supreme Court has explained, "the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006); *see Muldrow v. City of St. Louis*, 601 U.S. 345, 354 (2024) (same). Because "the concept of discrimination includes an element of injury or harm," 89 Fed. Reg. at 33,815, Title IX prohibits "only" those sex-based distinctions "that subject[] any person to legally cognizable injury—*i.e.*, more than de minimis harm," *id.* at 33,814. The Rule thus explains that recipients generally may not separate or differentiate on the basis of sex where doing so causes harm.

At the same time, the Department "does not interpret Title IX to prohibit all sex-based distinctions or separation." 89 Fed. Reg. at 33,814. Rather, the Rule recognizes that in certain contexts Congress permitted recipients to separate or distinguish on the basis of sex, even if doing so causes cognizable harm. *See* 89 Fed. Reg. at 33,816. Those limited contexts permit, among other things, sex-separate fraternities and sororities, 20 U.S.C. § 1681(a)(6)(A); voluntary youth service organizations, *id.* § 1681(a)(6)(B); and living facilities, *id.* § 1686. The Rule effectuates

24

Congress's decision to treat those contexts differently by excepting them from § 106.31(a)(2)'s de minimis harm standard.  89 Fed. Reg. at 33,816.[6]

The Rule makes clear that § 106.31(a)(2)'s protections apply "with equal force to all students."  89 Fed. Reg. at 33,818.  It also specifies how the de minimis harm standard applies to gender-identity discrimination.  The Rule explains that, except as provided in the recognized exceptions, recipients must permit individuals to access sex-separate facilities and activities consistent with their gender identity because "prevent[ing] a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex."  34 C.F.R. § 106.31(a)(2).  As relevant here, the Department has long recognized that sex separation "in the context of bathrooms or locker rooms[] is not presumptively unlawful sex discrimination" because a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom or locker room, and vice versa.  89 Fed. Reg. at 33,818.  That is why existing regulations permit sex-separate "toilet, locker room, and shower facilities," so long as the facilities are "comparable."  34 C.F.R. § 106.33.  But it violates Title IX to bar transgender students from accessing restrooms that align with their gender identity

---

[6] Congress also legislated separately regarding Title IX's application to athletics, *see* Education Amendments of 1974, Pub. L. No. 93-380, tit. VIII, pt. D, § 844, 88 Stat. 484, 612.  As the district court correctly recognized, this case does not implicate the regulation concerning sex-separate athletic teams, which is the subject of a different, ongoing rulemaking.  *See* Appx.197; 89 Fed. Reg. at 33,817.

because doing so *does* cause cognizable harm and because restrooms are not exempted from the statute's general nondiscrimination mandate. 89 Fed. Reg. at 33,818. Consistent with that conclusion, various courts have held that school policies that prevent students from accessing the restrooms that correspond to their gender identity violate Title IX. *See, e.g.*, *A.C*, 75 F.4th at 769; *Grimm*, 972 F.3d at 616.

**2.** The district court found no fault in the statutory interpretation reflected in § 106.31(a)(2). It did not dispute that Title IX's nondiscrimination mandate generally prohibits sex differentiation or separation that causes more than de minimis harm. Nor did the court dispute the Department's conclusion—supported by ample case law—that preventing a person from participating in an education program or activity, including accessing a sex-separate facility, consistent with their gender identity subjects the person to harm.

The court nonetheless concluded that the application of § 106.31(a)(2)'s de minimis harm standard to some sex-separate spaces (*e.g.*, restrooms) but not others (*e.g.*, living facilities) rendered the Rule arbitrary and capricious. *See* Appx.196-197. But § 106.31(a)(2) reflects the distinctions that Congress itself drew in enacting Title IX. Congress (not the Department) expressly carved out sex-separate living facilities—amongst other contexts—from Title IX's general nondiscrimination mandate. *See* 89 Fed. Reg. at 33,816. Congress "could have, but did not," include an analogous exemption for sex-separate restrooms and locker rooms. *Id.* at 33,821. The Rule carefully adheres to the statutory language Congress actually enacted in

requiring that "a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury"—including by preventing individuals from participating in a sex-separate program or activity consistent with their gender identity—"unless there is a statutory basis for allowing otherwise." *Id.* at 33,814.  The Department hardly acted arbitrarily in recognizing the distinctions drawn by Congress and effectuating Title IX's nondiscrimination mandate accordingly.[7]

### C. The Rule's Prohibition on Hostile-Environment Harassment Raises No First Amendment Concerns.

The district court also erred in holding that the Rule's prohibition on sex-based harassment—particularly, the application of § 106.2's definition of hostile-environment harassment to certain contexts involving gender-identity discrimination—contravenes the First Amendment.  Appx.189-192.  The court's conclusion rests on a basic misapprehension of how the hostile-environment standard operates as well as a disregard for longstanding antidiscrimination practice and principles.

**1.** It is well established that prohibited sex discrimination under Title IX includes sex-based harassment.  *See Jackson*, 544 U.S. at 174.  One form of prohibited

---

[7] Plaintiff also argued below that § 106.31(a)(2) was arbitrary and capricious for, in its view, failing to address concerns related to privacy, safety, and compliance.  *See* Appx.085-087.  But the district court did not enjoin the Rule on those grounds, and for good reason:  The Department thoroughly addressed those concerns in the Rule. *See* 89 Fed. Reg. at 33,819-822.

harassment is hostile-environment harassment, which § 106.2 defines as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." 34 C.F.R. § 106.2.

The Rule makes a handful of changes to the definition of hostile-environment harassment promulgated in 2020, but the standard announced in § 106.2 is hardly novel. *See* 89 Fed. Reg. at 33,497. It closely tracks the Department's "longstanding interpretation of Title IX" and accompanying "enforcement practice" prior to the 2020 amendments. *Id.* at 33,508; *see Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512 (Jan. 19, 2001).[8] It also mirrors the standards applied by courts in the context of "numerous civil rights laws, including Title VII." 89 Fed. Reg at 33,508; *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (applying a "severe or pervasive" standard to conduct that "alter[ed] the conditions" of employment (quotation marks omitted)). That includes this Court, which has long assessed "Title IX discrimination claims" premised on

---

[8] Whereas the 2020 standard prohibited unwelcome sex-based conduct "determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person" access to an education program or activity, 34 C.F.R. § 106.30(a)(2) (2020), the Rule prohibits unwelcome sex-based conduct that "based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies" such access, 34 C.F.R. § 106.2.

hostile-environment harassment "under the same legal analysis as Title VII claims."

*Throupe v. University of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021) (quotation marks omitted).

Prior to litigation over the Rule, no court had held that the standards long applied in the Title VII and Title IX contexts for evaluating hostile-environment harassment contravened the First Amendment. To the contrary, the Supreme Court upheld "similar proscriptions on hostile environment harassment" in both contexts "without raising any First Amendment concerns." 89 Fed. Reg. at 33,506 (citing examples). That makes sense: A recipient can ensure that the classroom, like the workplace, is free from sex-based "intimidation, ridicule, and insult" without governing every "utterance," *Harris*, 510 U.S. at 21 (quotation marks omitted), and while safeguarding the right of individuals to engage in protected speech.

If any doubt remained, the Rule also makes clear that "nothing in the regulations"—including § 106.2—"requires or authorizes a recipient to violate anyone's First Amendment rights." 89 Fed. Reg. at 33,516; *see also* 34 C.F.R. § 106.6(d). Thus, while recipients must address hostile environments, the Department expressly recognized that the "First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech." 89 Fed. Reg. at 33,503.

**2.** The district court concluded that § 106.2's hostile-environment standard is invalid for departing from the standard for private damages actions announced in

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999).

Appx.189-191. That is mistaken.

In *Davis*, the Supreme Court addressed the "scope of liability in private damages actions" under Title IX's judicially implied right of action, 526 U.S. at 641, a context in which courts have "a measure of latitude to shape a sensible remedial scheme that best comports with the statute," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). The question in *Davis* was "whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages." 526 U.S. at 639. The Court thus addressed "the proper definition of 'discrimination' in the context of a private damages action." *Id.* at 649. In that specific "context," *id.*, the Court concluded that schools "are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *id.* at 650.

Nothing in *Davis* suggested that the standard for damages liability that the Supreme Court announced as part of its authority to shape the judicially implied private right of action controls in the administrative-enforcement context. Rather, the Court recognized that those contexts present different questions, explaining that "we are asked to do more than define the scope of the behavior that Title IX proscribes" in determining what conduct "support[s] a private suit for money damages." *Davis*,

30

526 U.S. at 639. The Court also repeatedly and approvingly cited the then-applicable hostile-environment standard that governed the Department's own enforcement efforts, *id.* at 647-48, 651, which—like the Rule—defined prohibited sex-based harassment to include "severe, persistent, or pervasive" conduct, 62 Fed. Reg. 12,034, 12,034 (Mar. 13, 1997). The Court in *Davis* thus addressed only the circumstances under which a particular type of defendant (schools) could be found liable for a particular type of remedy (damages). Indeed, even the 2020 rule recognized that the "Department has regulatory authority to select conditions and a liability standard different from those used in the [*Davis*] framework" and thus did "not simply codify" *Davis.* 85 Fed. Reg. at 30,033.

Nor is there any indication, as the district court suggested, that the *Davis* damages standard was designed to avoid First Amendment concerns. Appx.191-192. Although the dissent discussed the First Amendment, the majority nowhere suggested that its holding was motivated by such concerns. *See Davis*, 526 U.S. at 667 (Kennedy, J., dissenting). Rather, the Court made clear that the standard reflected the appropriate limits on Title IX's judicially implied damages action, *see id.* at 640 (majority opinion), which implicates issues of fair notice not presented in the administrative-enforcement context, *see Gebser*, 524 U.S. at 290 (explaining that federal funding can be terminated administratively only after "notice and unsuccessful efforts to obtain compliance" and limiting potential exposure to private damages liability under Title IX to "comparable conditions").

**3.** The Rule also is not overly "broad" or "vague." Appx.192. An overbroad law prohibits a "substantial" amount of protected speech "judged in relation to its plainly legitimate sweep," while a vague law "fails to provide … a reasonable opportunity to understand what conduct it prohibits" and "encourages arbitrary and discriminatory enforcement." *Harmon v. City of Norman*, 61 F.4th 779, 795, 797-98 (10th Cir. 2023) (alteration and quotation marks omitted). This Court has warned that because "facial" invalidation of an overbroad or vague regulatory scheme "push[es] the judiciary towards the edge of its traditional purview and expertise, courts must be vigilant in applying a most exacting analysis to such claims." *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005). Such "strong medicine" is not warranted here. *Id.* at 1246.

The hostile-environment standard poses no overbreadth problems. It "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits or denies a person's ability to participate in" an education program or activity. 89 Fed. Reg. at 33,503. The Rule "only prohibit[s] conduct that meets all the[se] elements" and requires an evaluation based on the "totality of the circumstances" to ensure that no "required element[] … is ignored." *Id.* at 33,506. Even if the prohibition occasionally "sweeps in speech," *id.* at 33,494, there is no indication that the standard prohibits a substantial amount of protected speech in an absolute sense or relative to the Rule's "plainly legitimate sweep." *Harmon*, 61 F.4th at 795 (quotation marks omitted); *Rowles v. Curators of the Univ. of Mo.*,

983 F.3d 345, 358-59 (8th Cir. 2020) (upholding harassment policy against overbreadth challenge).

The district court nowhere identified a "substantial number of … applications" in which the hostile-environment standard is "unconstitutional." *Harmon*, 61 F.4th at 795 (quotation marks omitted). Instead, the court focused on the Rule's application to a narrow set of contexts involving gender identity. Appx.190. Even in that context, nothing in the Rule compels any particular speech by students or staff, nor requires anyone to affirm "any particular view on any issue." 89 Fed. Reg. at 33,505. This Court, moreover, is "vigilant in applying a most exacting analysis" to the requirement that overbreadth be "substantial," *Ward*, 398 F.3d at 1247, and "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge," *Members of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

The district court similarly erred in concluding that the Rule is overbroad because § 106.2's hostile-environment standard may implicate conduct "outside the classroom and off campus." Appx.190. As the Department explained, a recipient's obligation is to address a hostile environment occurring "under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside" the program or activity. 89 Fed. Reg. at 33,530. That is consistent with Supreme Court precedent, which recognizes that "the special characteristics that give schools additional license to regulate student speech" do not

"always disappear when a school regulates speech that takes place off campus."

*Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 188 (2021). In particular, the

Court has recognized "several types of off-campus behavior that may call for school

regulation," including "serious or severe bullying or harassment." *Id.*; *see also Kutchinski*

*ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 357-58 (6th Cir. 2023) (holding

that schools may regulate "off-campus speech that materially disrupts classwork or

involves substantial disorder or invasions of the rights of others," such as social media

posts that cause "serious or severe harassment" of teachers and students (quotation

marks omitted)).

Section 106.2's hostile-environment standard also is not vague. It offers

"specific and required elements," 89 Fed. Reg. at 33,506, "using language with

common usage and understanding" in the nondiscrimination context, *Rowles*, 983 F.3d

at 358. And it enumerates relevant considerations based on factors that "courts and

agencies have used in evaluating a hostile environment" for decades in both the Title

VII and Title IX contexts. 89 Fed. Reg. at 33,512. Indeed, the Rule discussed the

required elements at length, including addressing the "objectively offensive" and

"limits or denies" elements that the court questioned, Appx.190; *see* 89 Fed. Reg. at

33,509 (addressing "Subjectively and Objectively Offensive"); *id.* at 33,511 ("Limits or

Denies"). Likewise, the standard is not vague merely because it applies to

discrimination based on "gender identity," a term that the Department declined to

define. *Contra* Appx.192. While the Department observed that "a specific definition"

was unnecessary because the "term is now well understood" and "used widely in laws and policies," the Rule nonetheless explained that gender identity "describe[s] an individual's sense of their gender, which may or may not be different from their sex assigned at birth." 89 Fed. Reg. at 33,809. The hostile-environment standard's specificity and long lineage more than suffices to put the public on constitutionally adequate notice of its contours and demonstrates that it is neither unworkable nor prone to arbitrary enforcement.

## II. The Remaining Factors Weigh Against Preliminary Injunctive Relief.

The preliminary injunction should be vacated for the independent reason that plaintiff has not made the requisite "clear showing" that the remaining preliminary injunction factors are satisfied. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiff has not established that it will suffer immediate and irreparable harm absent the injunction. Nor has plaintiff demonstrated that the balance of harms and public interest weigh in favor of preliminary relief.

### A. Plaintiff Failed to Establish Irreparable Harm.

A showing of irreparable harm is an essential "prerequisite for the issuance of a preliminary injunction." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quotation marks omitted). Demonstrating such harm "is not an easy burden to fulfill," *id.* (quotation marks omitted); the asserted "injury must be certain, great, actual[,] and not theoretical," *Heideman v. South Salt Lake City*, 348 F.3d 1182,

1189 (10th Cir. 2003) (quotation marks omitted).  The district court erred in concluding that plaintiff made that showing.

The court's irreparable harm analysis invoked the sovereign harm arising from purported conflicts between the Rule and Oklahoma law.  Appx.198-199.  But many of the purportedly conflicting state laws or policies that plaintiff cited—and to which the court appeared to refer—are perfectly consistent with the Rule.  *See* Appx.088 (citing laws about athletic teams and free speech rights); Appx.199 (asserting that under the Rule, plaintiff "will be enjoined from effectuating [Oklahoma] laws").  And even if there were a conflict between the Rule and the requirements of Oklahoma law, "it is black-letter law that the federal government does not invade areas of state sovereignty simply because it exercises its authority in a way that preempts conflicting state laws," *Florida v. Department of Health & Human Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021) (alteration and quotation marks omitted).  "Indeed, to conclude otherwise would mean that a state would suffer irreparable injury from all … federal laws with preemptive effect."  *Id.* at 1292; *see also New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1255 (10th Cir. 2017) (holding that agencies' actions "complying with their congressionally-mandated responsibility" did not "invade[] or harm[] the State's sovereign interests").

Similarly, the district court's abstract concerns about First Amendment rights cannot justify a preliminary injunction.  The court nowhere specified whose First Amendment rights were immediately threatened or how.  *See* Appx.198.  Nor did

plaintiff identity any individual facing an "objectively justified fear of real consequences" from the exercise of their First Amendment rights. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) (en banc) (quotation marks omitted). Even if plaintiff had done so, it cannot assert the constitutional rights of its citizens, as a "State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (quotation marks omitted).

Lastly, plaintiff cannot establish irreparable harm by vaguely gesturing to compliance costs incurred as a result of the Rule. *Contra* Appx.199. Plaintiff made no effort to identify its supposed compliance costs, much less demonstrate that any such costs are "serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quotation marks omitted). Nor did plaintiff make any effort to show that any compliance costs incurred were related to the provisions of the Rule it actually challenged. Absent such a showing, courts routinely reject claims of irreparable harm premised on undifferentiated costs. *See Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 68 (D.D.C. 2020) (rejecting claims of irreparable harm in challenge to 2020 Title IX rule); *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 304 (S.D.N.Y. 2020) (same).

## B.    The Equities and Public Interest Weigh Against an Injunction.

The remaining factors tilt decisively towards the Department.  Every time the federal government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted). The Rule effectuates Title IX's goals of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. University of Chi.*, 441 U.S. 677, 704 (1979).  No one disputes that preventing discrimination serves a compelling public interest.

Plaintiff, by contrast, has established no cognizable harm from complying with the Rule while it litigates its claims. *See supra* pp. 35-37.  In any case, any such harms would be outweighed by the government's interest in stamping out sex discrimination and ensuring all students have equal access to federally funded educational opportunities.  *Cf. Winter*, 555 U.S. at 23 (public interest in naval training "outweighed" irreparable injury to wildlife).

## III.   At a Minimum, the Injunction Is Overbroad.

Finally, at a minimum, the preliminary injunction was overbroad, for "injunctive relief should be no more burdensome to the defendant than necessary to

provide complete relief to the plaintiffs" on their valid claims. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

**A.** The district court plainly erred in enjoining the many provisions of the Rule that plaintiff did not challenge and that the court did not find unlawful. The court acknowledged that its decision addressed only three discrete Rule provisions—namely, § 106.10, § 106.31(a)(2), and § 106.2's definition of hostile-environment harassment. *Contra* Appx.201. But the Rule made dozens of unrelated changes, most of which have nothing to do with gender identity. To identify a few specific examples:

- The Rule requires schools to provide pregnant and post-partum students with reasonable modifications and to inform pregnant students of their rights. 34 C.F.R. § 106.40(b).

- The Rule alters the definition of "complainant" to permit complaints by former students and employees who suffered discrimination while participating or attempting to participate in a covered program. 34 C.F.R. § 106.2; *see* 89 Fed. Reg. at 33,481-33,884.

- The Rule clarifies that funding recipients must prohibit retaliation, including peer retaliation, and take appropriate action in response to information about conduct that reasonably may constitute retaliation. 34 C.F.R. § 106.71.

- The Rule provides schools with more flexibility regarding the timing and structure of their grievance procedures. 34 C.F.R. §§ 106.45-106.46.

- The Rule affirms that recipients may disclose certain information to parents and legal guardians about their minor children. 34 C.F.R. § 106.44(j)(2).

None of those amendments depends in any way on the challenged provisions addressing gender-identity discrimination and harassment. All of them would remain

fully operative if the challenged provisions were enjoined in whole or in part. And each of them could easily have been issued as separate rules.

The district court's decision to enjoin unaddressed provisions of the Rule is particularly problematic because, as the court recognized, Appx.201, the Department specified that the Rule's provisions are "intended to operate independently of each other," 89 Fed. Reg. at 33,848. The Department left no doubt that pre-existing severability clauses in the Title IX regulations apply to the Rule. *Id.* Those clauses make clear that "[i]f any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby." 34 C.F.R. §§ 106.9, 106.16, 106.48. The Rule thus expressly instructs that "the potential invalidity of one provision should not affect the other provisions." 89 Fed. Reg. at 33,848.

In particular, the Rule specifies that provisions not deemed unlawful "operate separately from the clarification of the scope of sex discrimination under § 106.10." 89 Fed. Reg. at 33,848. Even if § 106.10 remained enjoined, every other provision of the Rule's amendments would continue to function simply by operating under Title IX's prohibition against discrimination "on the basis of sex," without any further regulatory gloss. That includes the unchallenged definitions in § 106.2; the requirements for Title IX Coordinators in § 106.8; the protections for pregnant and post-partum students in § 106.40; the provisions specifying recipients' obligations to

respond to discrimination in § 106.44; the grievance-procedure provisions in § 106.45 and § 106.46; the duties of employers in § 106.57 and § 106.60; and the clarification regarding retaliation in § 106.71.

Indeed, the Title IX regulations have long operated without such a regulatory gloss. The Department's pre-existing regulations (amended in 2020) repeatedly reference "sex discrimination" without defining that term or clarifying its scope. *See, e.g.*, 34 C.F.R. § 106.8(a) (2020) (Title IX coordinators); *id.* § 106.8(c) (2020) (grievance procedures); *id.* § 106.8(d) (2020) (extraterritoriality); *id.* § 106.71(a) (2020) (retaliation). Earlier regulations, too, have long referred to "discrimination on the basis of sex" and "discrimination based on sex" without defining those terms. *E.g.*, 45 C.F.R. §§ 86.1, 86.3(a)-(b), 86.4, 86.6(a), 86.9(a), (c), 86.36(a)-(c), 86.37(a)(2), (b), 86.38(a), 86.39, 86.51(a)(4), 86.53, 86.56(b), 86.59 (1975). The term "sex discrimination" or its variants has been ubiquitous in the Department's Title IX regulations for decades, and both the Department and regulated entities have understood that term to simply incorporate Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. § 1681(a), which confirms that analogous provisions of the Rule would likewise remain fully operative even if § 106.10 were enjoined.

**B.** The district court also erred in enjoining § 106.10 and § 106.2 beyond its definition of hostile-environment harassment as applied to discrimination on the basis of gender identity. Even putting aside plaintiff's failure to demonstrate a likelihood of success on its challenge to § 106.10, *see supra* pp. 16-23, plaintiff does not identify any

harm it would suffer if Oklahoma schools could not engage in conduct that all agree would discriminate on the basis of gender identity (let alone on the other bases listed in § 106.10), such as barring transgender students from participating in the science fair, the marching band, or student government. Plaintiff has never suggested that it wishes to punish students "simply for being … transgender." *Bostock*, 590 U.S. at 651.

Likewise, § 106.2 includes amended definitions of various terms used throughout the Title IX regulations. Plaintiff did not challenge any of these definitions besides hostile-environment harassment, and it principally objected to the application of the hostile-environment standard to discrimination on the basis of gender identity. *See* Appx.190 (addressing the "refusal to affirm someone's gender identity"). Accordingly, there was no basis for enjoining any more of § 106.2 than the definition of hostile-environment harassment as applied to gender-identity discrimination.

**C.** The Supreme Court's denial of the stay applications in the related actions does not justify upholding the district court's overbroad injunction here. As the Supreme Court emphasized, the stay applications were evaluated in an "emergency posture" and on a "limited record" where "the burden is on the Government as applicant to show" entitlement to emergency relief. *Louisiana*, 603 U.S. at 868. Here, by contrast, the burden is on plaintiff to justify the district court's sweeping injunction. *See Heideman*, 348 F.3d at 1189. As explained, plaintiff cannot do so, as the court "went beyond [its] authority to remedy the discrete harms alleged here" by

42

"blocking the Government from enforcing scores of regulations that [plaintiff] never challenged and that bear no apparent relationship to [its] alleged injuries." *Louisiana*, 603 U.S. at 869 (Sotomayor, J., dissenting in part).

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRIAN M. BOYNTON

*Of Counsel:*

*Principal Deputy Assistant Attorney General*

LISA BROWN
*General Counsel*
*U.S. Department of Education*

MELISSA N. PATTERSON
/s/ David L. Peters

DAVID L. PETERS
JACK STARCHER
STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7209*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1673*
*david.l.peters@usdoj.gov*

November 2024

**STATEMENT REGARDING ORAL ARGUMENT**

The federal government respectfully requests oral argument. The district court preliminarily enjoined the Department from enforcing a regulation implementing Title IX's prohibition on discrimination on the basis of sex in education programs or activities receiving federal financial assistance. Oral argument would facilitate the Court's consideration of the case.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,399 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ David L. Peters*
David L. Peters

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ David L. Peters*
David L. Peters

# ADDENDUM

**20 U.S.C. § 1681**

**§ 1681. Sex**

(a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

(1) Classes of educational institutions subject to prohibition

in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

(2) Educational institutions commencing planned change in admissions

in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

(3) Educational institutions of religious organizations with contrary religious tenets

this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

(4) Educational institutions training individuals for military services or merchant marine

this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

(5) Public educational institutions with traditional and continuing admissions policy

in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and

continually from its establishment has had a policy of admitting only students of one sex;

(6) Social fraternities or sororities; voluntary youth service organizations

this section shall not apply to membership practices--

(A) of a social fraternity or social sorority which is exempt from taxation under section 501(a) of Title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

(B) of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

(7) Boy or Girl conferences

this section shall not apply to--

(A) any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(B) any program or activity of any secondary school or educational institution specifically for--

(i) the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(ii) the selection of students to attend any such conference;

(8) Father-son or mother-daughter activities at educational institutions

this section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

(9) Institution of higher education scholarship awards in "beauty" pageants

this section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has received such award in any pageant in which the attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals

of one sex only, so long as such pageant is in compliance with other nondiscrimination provisions of Federal law.

…

## 20 U.S.C. § 1682

### § 1682. Federal administrative enforcement; report to Congressional committees

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-24-00461-JD |
| | ) | |
| MIGUEL CARDONA, in his official capacity | ) | |
| as the Secretary of Education; and UNITED | ) | |
| STATES DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

"Our Constitution divided the 'powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (quoting *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983)). Our founders understood that, "[t]o safeguard individual liberty, '[s]tructure is everything.'" *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2275 (2024) (Thomas, J., concurring) (second alteration in original) (quoting A. Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 Notre Dame L. Rev. 1417, 1418 (2008)). So, "[b]ecause the Constitution gives the Executive Branch only '[t]he executive Power,' executive agencies may constitutionally exercise only that power." *Id.* at 2274 (second alteration in original) (quoting Art. II, § 1, cl. 1).

With these principles in mind, the Court tackles a question, at least preliminarily, that has not yet been addressed by the Supreme Court of the United States or the United States Court of Appeals for the Tenth Circuit: whether an agency exceeds its authority by

deciding that sex discrimination under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), includes discrimination based on gender identity.

Before the Court is the State of Oklahoma's ("State") Motion for Preliminary Injunction [Doc. No. 21]. The State seeks to preliminarily enjoin the United States Department of Education ("Department") from enforcing its new Title IX regulation: *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024) (to be codified at 34 C.F.R. § 106, et seq.) ("Final Rule"). The Final Rule consists of 423 pages.[1]

Defendants Miguel Cardona, in his official capacity as the Secretary of Education, and the United States Department of Education (collectively, "Department") filed a response [Doc. No. 40], and the State filed a reply [Doc. No. 43]. The Court also considers the State's supplement [Doc. No. 41] and the amicus brief filed by the states of New Jersey, California, Pennsylvania, Colorado, Delaware, District of Columbia, Hawaii, Illinois, Massachusetts, Michigan, Minnesota, New York, Oregon, Rhode Island, Vermont, and Washington [Doc. No. 45]. The parties also filed notices of supplemental authority. [Doc. Nos. 46, 47].

Upon review and consideration, and for the following reasons, the Court grants the State's Motion.

---

[1] This is according to https://www.govinfo.gov/content/pkg/FR-2024-04-29/pdf/2024-07915.pdf (last visited July 30, 2024), which is a three-column format PDF. According to Westlaw, the Final Rule is 664 pages in PDF format. 89 Fed. Reg. 33474, 2024 WL 1833438.

## I.   <u>BACKGROUND</u>

On April 29, 2024, the Department published the Final Rule. The Final Rule seeks

to "amend[] the regulations implementing Title IX" and "better align the Title IX

regulatory requirements with Title IX's nondiscrimination mandate." 89 Fed. Reg. at

33474.

The Final Rule "clarif[ies] that sex discrimination includes discrimination on the

basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual

orientation, and gender identity." *Id.* at 33476 (to be codified as 34 C.F.R. § 106.10). It

also imposes a "de minimis harm" standard, which states

> [i]n the limited circumstances in which Title IX or this part permits
> different treatment or separation on the basis of sex, a recipient must not
> carry out such different treatment or separation in a manner that
> discriminates on the basis of sex by subjecting a person to more than de
> minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and
> the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686
> and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a
> policy or engaging in a practice that prevents a person from participating in
> an education program or activity consistent with the person's gender
> identity subjects a person to more than de minimis harm on the basis of sex.

*Id.* at 33887 (to be codified as 34 C.F.R. § 106.31(a)(2)).

The Final Rule also changes Title IX's harassment regulations. Currently, sexual

harassment is defined as "conduct on the basis of sex" that is "[u]nwelcome conduct

determined by a reasonable person to be so severe, pervasive, *and* objectively offensive

that it effectively denies a person equal access to the recipient's education program or

activity." 34 C.F.R. § 106.30 (emphasis added). The Final Rule changes this term to "sex-

based harassment" and defines it as "sexual harassment and other harassment on the basis

of sex, including on the bases described in § 106.10." 89 Fed. Reg. at 33884 (to be codified as 34 C.F.R. § 106.2). "Hostile environment harassment" is then defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe *or* pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* (emphasis added). Plus, now "a recipient has an obligation to address a sex-based hostile environment under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States." *Id.* at 33530.

The Final Rule does not "articulate a specific definition of 'gender identity,'" but "[t]he Department understands gender identity to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* at 33809. Recipients of federal funds may "rely on a student's consistent assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher." *Id.* at 33819. They may not, however, "requir[e] a student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with their gender identity." *Id.*

The Final Rule takes effect on August 1, 2024. States and their schools risk losing federal funding if they do not comply with the Final Rule. 20 U.S.C. § 1681. Various states and entities filed lawsuits challenging the Final Rule and seeking to enjoin its enforcement. To the best of the Court's knowledge, almost every district court judge that

has ruled on a preliminary injunction in those cases has granted one and preliminarily

enjoined enforcement of the Final Rule.[2]

In Oklahoma, there are 1,805 public school sites serving primary and secondary

school-aged children. Okla. Dep't of Educ., Oklahoma Public Schools: Fast Facts 2021-

22, https://sde.ok.gov/sites/default/files/documents/files/Fast%20Facts%202021-22.pdf

(last visited July 30, 2024). In 2023, the federal government allocated $224,659,304 to

the Oklahoma State Department of Education to fund Oklahoma schools. Off. of

Elementary & Secondary Educ., Funding Status & Awards, Dep't of Educ.,

https://oese.ed.gov/offices/office-of-formula-grants/school-support-and-

---

[2] So far, the cases in which courts have preliminarily enjoined enforcement of the Final Rule include: *Louisiana v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 2978786, at *21 (W.D. La. June 13, 2024), *appeal docketed*, No. 24-30399 (5th Cir. June 25, 2024); *Tennessee v. Cardona*, --- F. Supp. 3d ----, 2024 WL 3019146, at *44 (E.D. Ky. June 17, 2024), *appeal docketed*, No. 24-5588 (6th Cir. June 26, 2024); *Kansas v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 3273285, at *22 (D. Kan. July 2, 2024), *appeal docketed*, No. 24-3097 (10th Cir. July 11, 2024); *Texas v. United States*, No. 2:24-CV-86-Z, 2024 WL 3405342, at *16 (N.D. Tex. July 11, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 3381901, at *7 (N.D. Tex. July 11, 2024); and *Arkansas v. U.S. Dep't. of Educ.*, No. 4:24 CV 636 RWS, 2024 WL 3518588, at *23 (E.D. Mo. July 24, 2024). In *Alabama v. Cardona*, No. 24-533, slip op. at 122, (N.D. Ala. July 30, 2024), the district judge denied the State of Alabama's motion for a preliminary injunction. *See* Defs.' Notice [Doc. No. 47].

The Fifth Circuit denied a request to stay a preliminary injunction in *Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887, at *1 (5th Cir. July 17, 2024). The Sixth Circuit denied a request to stay a preliminary injunction in *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *1 (6th Cir. July 17, 2024). The Department has filed applications for a partial stay of the injunction at the Supreme Court, but as of this Court's last review of the Supreme Court docket, the Supreme Court has not yet acted. *See Dep't of Educ. v. Louisiana*, (No. 24A78); *Cardona v. Tennessee*, (No. 24A79).

accountability/title-i-part-a-program/funding-status/ (last visited July 30, 2024). All these

schools receive federal funds, and thus, are Title IX recipients.[3]

The State filed suit on May 6, 2024, seeking declaratory judgment in its favor,

vacatur of the Final Rule, and a permanent injunction keeping the Department from

withholding Title IX funding from the State for refusal to comply with the Final Rule. It

filed its Motion on June 28, 2024. Expedited briefing concluded on July 18, 2024. Given

this timeframe, the quantity of legal challenges to the Final Rule, and the quality of the

recent orders filed in the cases granting preliminary injunctions, the Court will not fully

restate the regulatory landscape or Title IX's history. Instead, the Court focuses its

analysis on the portions of the 423-page Final Rule that are directly relevant to resolving

the State's Motion.

## II.    **LEGAL STANDARD**

To obtain a preliminary injunction, the State must show the following elements

weigh in its favor: "'(1) [it] is substantially likely to succeed on the merits; (2) [it] will

suffer irreparable injury if the injunction is denied; (3) [its] threatened injury outweighs

the injury the opposing party will suffer under the injunction; and (4) the injunction

would not be adverse to the public interest.'" *Brooks v. Colo. Dep't of Corr.*, 730 F.

---

[3] The Department does not dispute that the State receives funds from the federal
government, nor does it dispute the quantity of those funds. *See Dine Citizens Against
Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1028 n.5 (10th Cir. 2023) ("It is within this
court's discretion to take judicial notice of a fact or a document. 'Judicial notice is proper
when a fact is beyond debate.'" (internal citation omitted) (quoting *The Estate of Lockett
ex rel. Lockett v. Fallin*, 841 F.3d 1098, 1111 (10th Cir. 2016))).

App'x 628, 630 (10th Cir. 2018) (unpublished) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)). The third and fourth elements "merge" when the government is the party opposing the preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citations omitted).[4]

"'Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.'" *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 370 (10th Cir. 1996) (alteration in original) (emphasis omitted) (quoting Fed. R. Civ. P. 65). "[T]rial courts have 'wide discretion under Rule 65(c) in determining whether to require security . . . .'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (quoting *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)).

---

[4] There are three types of preliminary injunctions that are disfavored: "'(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.'" *Id.* at 1259 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc)). Neither party argues that the State's requested injunction falls into any of these categories. But even if it did, the Court is satisfied the State has made a "'strong showing'" that the "likelihood-of-success-on-the-merits and the balance-of-harms factors" weigh in its favor. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quoting *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)).

III.   <u>ANALYSIS</u>

**A. The State is substantially likely to succeed on the merits.**

Starting with the first element, the State argues it is substantially likely to succeed on the merits of its case because the Final Rule exceeds statutory authority, violates the Constitution, and is arbitrary and capricious. As further explained below, the Department disagrees with these arguments.[5]

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" unless an enumerated exception applies. 20 U.S.C. § 1681(a). Congress "empowered" the Department to issue "rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute . . . ." 20 U.S.C. § 1682.

However, Congress also enacted the Administrative Procedure Act ("APA") "'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). The APA "was the culmination of a 'comprehensive rethinking of the place of administrative agencies in a regime of separate and divided powers.'" *Id.* (quoting

---

[5] In its Motion, the State briefly argued that the Final Rule violates the Tenth Amendment. The Department briefly responded to this argument in its Response. The Court does not address this claim because even without it, the State has shown it is substantially likely to succeed on the merits.

*Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986)). Under the

APA, courts "shall decide all relevant questions of law, interpret constitutional and

statutory provisions, and determine the meaning or applicability of the terms of an agency

action." 5 U.S.C. § 706. It requires courts to "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," "contrary to constitutional right," "in excess of

statutory jurisdiction," or "without observance of procedure required by law." *Id.*

1.  The Department's interpretation of "sex" exceeds its statutory authority.

The State argues that the Final Rule is contrary to Title IX's text, and therefore,

the Department's implementation of the Final Rule exceeds its statutory authority. The

Department argues that the Final Rule's "specification that Title IX prohibits

discrimination on the basis of gender identity is compelled by the statutory text." [Doc.

No. 40 at 13].

"[W]hen a particular statute delegates authority to an agency consistent with

constitutional limits, courts must respect the delegation, while ensuring that the agency

acts within it." *Loper*, 144 S. Ct. at 2273. When analyzing whether an agency has acted

within its statutory authority, the Court starts with the text of the statute. *Id.* at 2262

("The APA, in short, incorporates the traditional understanding of the judicial function,

under which courts must exercise independent judgment in determining the meaning of

statutory provisions."). "Proper interpretation of a word 'depends upon reading the whole

statutory text, considering the purpose and context of the statute, and consulting any

precedent[s] or authorities that inform the analysis.'" *United States v. Ko*, 739 F.3d 558,

560 (10th Cir. 2014) (alteration added) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)).

   "Sex" is not defined in Title IX. However, "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper*, 144 S. Ct. at 2262. And, as this Court has previously noted, "at the time Title IX was enacted, 'sex' was defined by biology and reproductive functions"—not gender identity or sexual orientation. *Bridge ex rel. Bridge v. Okla. State Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 150598, at *7 (W.D. Okla. Jan. 12, 2024). Numerous dictionaries published around the time of Title IX's passage confirm this conclusion. *See infra* note 8; *cf. In re Mallo*, 774 F.3d 1313, 1321 (10th Cir. 2014) ("Dictionary definitions are useful touchstones to determine the 'ordinary meaning' of an undefined statutory term." (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012))). In fact, the Department does not appear to say otherwise. Instead, it maintains that per the amended 34 C.F.R. § 106.10, (biological) sex discrimination by definition includes discrimination on the basis of gender identity. It premises this argument on *Bostock v. Clayton County*, 590 U.S. 644 (2020).

   In *Bostock*, the Supreme Court ruled that an employer violates Title VII of the Civil Rights Act of 1964 by firing an individual "for being gay or transgender." *Id.* at 683. However, it made clear that the opinion did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination." *Id.* at 681. Even in the Title VII context, the Supreme Court did "not purport to address bathrooms, locker rooms, or

anything else of the kind." *Id.* The opinion only answered the question of "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.*

In light of these disclaimers, the Court is not convinced that *Bostock* stands for the proposition that sex discrimination occurs anytime someone is treated differently based on their gender identity. Yet, that is essentially what the Department argues. "[I]t is suspect that the Department bases its explanation for changing its interpretation of a term—again, whose meaning has been unchanged since the statute was enacted—by relying on reasoning that the highest court said was inapplicable." *Tennessee v. Cardona*, --- F. Supp. 3d ----, 2024 WL 3019146, at *33 (E.D. Ky. June 17, 2024). Plus, if *Bostock*'s rationale does not even apply to bathrooms or locker rooms in the Title VII context, why would it apply to bathrooms and locker rooms in the Title IX context? The Department does not offer an adequate explanation to this question.

Additionally, such an interpretation would be at odds with Title IX's purpose. Leading up to Title IX's passage, all relevant congressional statements, hearings, and reports focused on discrimination *women* faced in education. *See* 116 Cong. Rec. 6398, 6400 (1970) (Rep. Martha Griffiths) ("It is shocking and outrageous that universities and colleges, using Federal moneys, are allowed to continue treating women as second-class citizens, while the Government hypocritically closes its eyes."); 117 Cong. Rec. 22735, 22735 (1971) (Sen. Birch Bayh) ("To my mind our greatest legislative failure relates to our continued refusal to recognize and take steps to eradicate the pervasive, divisive, and unwarranted discrimination against a majority of our citizens, the women of this

country."); 118 Cong. Rec. 5806, 5808 (1972) (Sen. Birch Bayh) ("While the impact of this [proposed legislation] would be far-reaching, it is not a panacea. It is, however, an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work.").

This purpose is confirmed by Title IX's text. Yet the Final Rule elevates gender identity and its accompanying protections above that of biological sex—i.e., women. Such a contradiction of Title IX's text and an erosion of its purpose cannot be permitted absent congressional action.[6] Of course, the Court understands that the Department only seeks to enact regulations that the executive branch believes are beneficial to the nation. However, "[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983).

---

[6] In the past, when courts have determined that a statute's text does not protect certain groups of people, Congress has stepped in and passed legislation so the people's will is effectuated. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 88–89 (1983) ("[T]his Court ruled that discrimination based on pregnancy was not sex discrimination under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e et seq. (1976 ed.). *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S. Ct. 401, 50 L. Ed. 2d 343 (1976). Congress overcame the *Gilbert* ruling by enacting § 1 of the Pregnancy Discrimination Act of 1978, 92 Stat. 2076, 42 U.S.C. § 2000e(k) (1976 ed., Supp. V), which added subsection (k) to § 701 of the Civil Rights Act of 1964.") (footnotes omitted). That is the proper mechanism for expanding statutory protections. It is not by enacting far-reaching regulations or turning to the judiciary for expansion.

Having considered the statute's unambiguous text, purpose, and other subsequent binding precedent, such as *Bostock*, the Court concludes the State is likely to succeed on its claim that the Department exceeded its statutory authority under Title IX by implementing a regulation that expands sex discrimination to include discrimination on the basis of gender identity.[7]

2.  Even if the Department did not clearly exceed its authority, the major questions doctrine counsels against adopting the Department's interpretation and expansion of Title IX.

The State argues that by enacting the Final Rule, the Department seeks to decide a major question that Congress did not clearly authorize it to decide. The Department argues that the major questions doctrine is inapplicable because the text of the statute controls, and the Final Rule is consistent with Title IX's text.

As stated previously, Title IX's unambiguous and clear text shows the State is substantially likely to succeed on the merits of its case. However, if the statute's text contained ambiguity regarding whether discrimination on the basis of sex also included discrimination based on "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," the major questions doctrine would counsel against such an interpretation. "[I]n certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make [the

---

[7] Grounding much of its analysis in *Bostock*, the Tenth Circuit recently decided that discrimination based on transgender status is discrimination on the basis of sex that implicates the Equal Protection clause. *Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024). But nothing in *Fowler* suggests it applies outside the Equal Protection context. And for the same reasons as stated above, absent a mandate to the contrary, the Court will not apply *Fowler*'s analysis to Title IX—a statutory framework to which it is ill suited.

Supreme Court] 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Thus, the "[m]ajor [q]uestions [d]octrine applies where 'an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy' or make 'decisions of vast economic and political significance.'" *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 725 (10th Cir. 2024) (quotations omitted) (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324). In such situations, the doctrine requires "something more than a merely plausible textual basis for the agency action." *West Virginia*, 597 U.S. at 723. "The agency instead must point to 'clear congressional authorization' for the power it claims." *Id.* (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

The Department's claim that it can expand "sex" in Title IX to include "gender identity" despite several decades of "sex" solely meaning the biological differences between men and women falls flat. *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) (explaining that "sex, like race and national origin, is an immutable characteristic"); *United States v. Virginia*, 518 U.S. 515, 533 (1996) (using the term "sex classifications" when discussing laws and policies that treat individuals based on whether they are biological "women" or "men"); *see also id.* (discussing the "[i]nherent differences between men and women" without referring to gender identity). The debate regarding the relationship between sex and gender identity is a motivating factor behind countless lawsuits, legislation, and political debates. The enactment of the Final Rule is the essence of an agency claiming to discover, in a statute that has been

enacted for over fifty years, a previously unknown power to decide how broadly "sex" is defined and applied—i.e., a decision of vast political significance. So, even if there was a plausible textual basis for the Department's interpretation of Title IX, the Department would need to point to clear congressional authorization for its ability to redefine sex in a way that includes or implicates gender identity. The Department has not done so, and Congress has not clearly given the Department authority to redefine sex in a way that would be inconsistent with other portions of the statute. Therefore, the Court determines the State is substantially likely to succeed on its claim that the major questions doctrine prohibits the Department from enforcing the Final Rule.

3. <u>The State is substantially likely to succeed on its constitutional claims.</u>

a. *The Final Rule likely violates the First Amendment.*

The State argues that the Final Rule's new harassment provisions violate the First Amendment and contradict *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 640 (1999). The Department argues that the Final Rule has no such problems because it explicitly provides that "'nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment.'" [Doc. No. 40 at 25] (quoting 89 Fed. Reg. at 33503). Additionally, it notes that the standard set forth in the Final Rule does not need to comply with *Davis* because "*Davis* addressed the standard required in a private action for damages," not administrative enforcement. *Id.* at 22.

The First Amendment states, "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. "First Amendment rights, applied in light

15

of the special characteristics of the school environment, are available to teachers and students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). In *Davis*, the Supreme Court held that "in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." 526 U.S. at 652. This standard for harassment accounted for both a school's need to exercise "disciplinary authority" and limit exposure "to constitutional or statutory claims." *Id.* at 649. The Supreme Court highlighted, however, that, Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Id.* at 644. "Moreover, because the harassment must occur 'under' 'the operations of' a funding recipient, *see* 20 U.S.C. § 1681(a); § 1687 (defining 'program or activity'), the harassment must take place in a context subject to the school district's control . . . ." *Id.* at 645.

The amended 34 C.F.R. § 106.2 has significantly strayed from this standard. It has changed the "severe *and* pervasive" standard to a "severe *or* pervasive" standard, altered the "denies" equal access condition to a "limits or denies" equal access condition, and added a subjective component to the "objectively offensive" requirement. The Final Rule does not define what "objectively offensive" means, but given the regulation's text, it is reasonable to assume that refusal to affirm someone's gender identity would fall into this category. Perhaps most notably, it largely expands the Department's reach outside the classroom and off campus. For example, the Final Rule says

16

> a recipient's obligation is to address all forms of sex discrimination,
> including sex-based harassment that occurs within the recipient's education
> program or activity, whether the conduct takes place online, in person, or
> both. Online harassment can include, but is not limited to, unwelcome
> conduct on social media platforms such as sex-based derogatory name-
> calling, the nonconsensual distribution of intimate images (including
> authentic images and images that have been altered or generated by
> artificial intelligence (AI) technologies), cyberstalking, sending sex-based
> pictures or cartoons, and other sex-based conduct that, based on the totality
> of the circumstances, is subjectively and objectively offensive and so
> severe or pervasive that it limits or denies a person's ability to participate in
> or benefit from the recipient's education program or activity.

89 Fed. Reg. 33474, 33515.

Regardless, the Department argues the *Davis* standard is not binding because a suit

for damages is different than administrative enforcement. In support, it highlights that

prior regulations imposed a standard similar to that which is found in the Final Rule. *See*

1997 Sexual Harassment Guidance, 62 Fed. Reg. 12034, 12040 (condemning harassment

that was "sufficiently severe, persistent, or pervasive to create a hostile environment").

But this argument minimizes the Final Rule's other changes that undeniably further

broaden the "severe or pervasive" standard. When the "severe or pervasive" standard is

applied alongside the expanded definition of sex discrimination in § 106.10 and the added

condition that a recipient must address a sex-based hostile environment even when the

alleged conduct occurred "outside the United States," the likelihood of a constitutional

violation is apparent. 89 Fed. Reg. 33530. Even the *Davis* Court explained that its

opinion applying the severe *and* pervasive standard should "not mislead courts to impose

*more sweeping liability than we read Title IX to require*." 526 U.S. at 652 (emphasis

added). And changing "and" to "or" only makes Title IX's liability more sweeping.

Whether conduct or speech is considered harassment under the Final Rule is dependent on broad statements and vague terminology that the Department has elected not to define. Additionally, the new harassment regulations in the amended § 106.2 do not comport with the standard set out in *Davis*. This, along with the above mentioned First Amendment concerns, leads the Court to conclude that these considerations weigh in favor of the State with respect to its substantial likelihood of success on the merits.

      b.   *The Final Rule's conditions likely violate the Spending Clause.*

The State argues that because Congress did not unambiguously state Title IX's prohibition against sex discrimination includes discrimination based on gender identity, the Final Rule's conditions are in violation of the Spending Clause. The Department continues to rely on *Bostock* and argues that "§ 106.10 merely sets forth the meaning of Title IX's unambiguous statutory text." [Doc. No. 40 at 30].

"The Spending Clause provides that '[t]he Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States.'" *Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 716 (10th Cir. 2004) (alterations in original) (quoting U.S. Const. art. I, § 8, cl. 1). Title IX is "legislation enacted pursuant to Congress' authority under the Spending Clause." *Davis*, 526 U.S. at 640. This type of legislation is "'much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "[B]ut when Congress attaches conditions to a State's acceptance of federal funds, the conditions must

18

be set out 'unambiguously . . . .'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548

U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17).

Congress chose to use the term "sex" in Title IX. "Sex" unambiguously means the

biological differences between male and female. In the context of Title IX, the concepts

of sex and gender identity are distinct and independent of one another. Thus, Title IX's

text does not give the State "clear notice" that its acceptance of funds is conditioned on

its treatment of an individual's gender identity. *See id.* at 300. Without clear notice

provided by Congress that "on the basis of sex" has been expanded to include gender

identity under Title IX, the Department cannot premise the receipt of federal funds off

compliance with the Final Rule. Therefore, this element weighs in favor of the State with

respect to its substantial likelihood of success on the merits.

4.  <u>The State is substantially likely to succeed in showing the Department acted in an
    arbitrary and capricious manner in passing the Final Rule.</u>

The State argues that the Department acted in an arbitrary and capricious manner

because (1) it failed to offer a reasoned explanation for the Final Rule's departure from

the historic understanding of "sex" and (2) the Final Rule is unexplainably internally

inconsistent. The Department contends the Final Rule is consistent with Supreme Court

precedent and that it "is not inconsistent for the Final Rule to distinguish sex separation

expressly permitted by Congress, listed in § 106.31(a)(2), from sex separation permitted

by regulation in other contexts." [Doc. No. 40 at 27].

According to the Tenth Circuit, an agency's decision is arbitrary and capricious

if the agency (1) "entirely failed to consider an important aspect of the
problem," (2) "offered an explanation for its decision that runs counter to

19

the evidence before the agency, or is so implausible that it could not be
ascribed to a difference in view or the product of agency expertise," (3)
"failed to base its decision on consideration of the relevant factors," or (4)
made "a clear error of judgment."

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir.

2017) (quoting *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683,

704 (10th Cir. 2009)). "The duty of a court reviewing agency action under the 'arbitrary

or capricious' standard is to ascertain whether the agency examined the relevant data and

articulated a rational connection between the facts found and the decision made."

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). "[T]he

arbitrary and capricious standard focuses on the rationality of an agency's decision

making process rather than on the rationality of the actual decision . . . ." *Colo. Wild v.*

*U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006).

The Final Rule's understanding of what "sex" means departs from the definition

this term had for decades.[8] Expanding the definition of such a crucial term creates

unexplained inconsistency with Title IX's text, purpose, and former Department

---

[8] In 1961, the Oxford English Dictionary defined sex as "[t]he sum of those
differences in the structure and function of the reproductive organs on the ground of
which beings are distinguished as male and female, and of the other physiological
differences consequent on these." *The Oxford English Dictionary* 578 (1961). In 1970,
the American College Dictionary defined sex as "the sum of the anatomical and
physiological differences with reference to which the male and the female are
distinguished." *The American College Dictionary* 1109 (1970). In 1979, Webster defined
it as "the sum of the structural, functional, and behavioral characteristics of living beings
that subserve reproduction by two interacting parents and that distinguish males and
females." *Webster's New Collegiate Dictionary* 1054 (1979). In 1996, the Supreme Court
recognized that the "[p]hysical differences between men and women . . . are enduring"
and the "'two sexes are not fungible . . . .'" *United States v. Virginia*, 518 U.S. 515, 533
(1996) (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)).

interpretations. *See* Dep't of Just. & Dep't of Educ., Dear Colleague Letter, Feb. 22,

2017, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf

(explaining that the Department is rescinding guidance documents "requir[ing] access to

sex-segregated facilities based on gender identity" because those guidance documents did

not "contain extensive legal analysis or explain how the position is consistent with the

express language of Title IX"). This is "a reason for holding an interpretation to be an

arbitrary and capricious change from agency practice under the [APA]." *Nat'l Cable &

Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). However, the

Department says there was not a "'long-standing construction' of the term 'sex' in Title

IX to mean 'biological sex.'" 87 Fed. Reg. 41390, 41537. Although it has previously

"articulated a narrower interpretation of the scope of Title IX's prohibition on sex

discrimination," *id.* at 41531 (citing 2001 Revised Sexual Harassment Guidance at 3;

2010 Dear Colleague Letter on Harassment and Bullying at 8; Preamble to the 2020

Amendments, 85 Fed. Reg. 30178), the Department "now believes that its prior position

(i.e., that Title IX's prohibition on sex discrimination does not encompass discrimination

based on sexual orientation and gender identity) is at odds with Title IX's text and

purpose and the reasoning of the *Bostock* Court." 87 Fed. Reg. at 41531.

 "Disagreement with its own past interpretation constitutes a concession that a

longstanding interpretation indeed has existed." *Tennessee v. Cardona*, --- F. Supp.

3d ----, 2024 WL 3019146, at *32 (E.D. Ky. June 17, 2024), *appeal docketed*, No. 24-

5588 (6th Cir. June 26, 2024). And the primary reason it gives for changing its

interpretation is *Bostock*. But for the reasons previously explained, basing the Final Rule

off *Bostock* does not reflect reasoned decision making. *Bostock* was never intended to have a sweeping impact on Title VII, let alone Title IX. "Ultimately, there is little reason in the Department's purportedly 'reasoned explanation' for departing from its longstanding interpretation of sex as a binary construct because *Bostock* did not expand the meaning of 'sex' within Title IX." *Id.* at *33.

Additionally, the gender identity mandate is inexplicably logically inconsistent with several provisions of Title IX. The Department acknowledges that Title IX "created exceptions to that general nondiscrimination mandate in 20 U.S.C. 1681(a)(1)–(9), and also carved out from its general nondiscrimination mandate the maintenance of sex-separate living facilities in 20 U.S.C. 1686." 89 Fed. Reg. 33474, 33818. And yet, the amended § 106.31 says recipients cannot discriminate on this basis when it comes to locker rooms or bathrooms if such action subjects "a person to more than de minimis harm." *Id.* at 33887. In application, this means recipients can have male and female dormitories and assign students to particular dorms based on their biological sex. However, for bathrooms and locker rooms, sex-separate facilities are only allowed to the extent they do not prevent individuals from using the bathroom or locker room consistent with their gender identities. So, if a biological male identifies as a female, the biological male can be required to sleep in the boys dorm but must be allowed to use the girls locker room. This approach undercuts Title IX's purpose, epitomizes a clear error in judgment, and entirely fails to consider important aspects of the problem the Department sought to resolve.

Therefore, the Court holds that the State is substantially likely to succeed in showing that the Department acted in an arbitrary and capricious manner.

5. <u>The Court does not consider the parties' arguments regarding athletics.</u>

To the extent the parties raise arguments regarding the Final Rule's impact on athletics, the Court does not consider these. The Final Rule explicitly "permits different treatment or separation on the basis of sex" in accordance with 34 C.F.R. § 106.41, which is the current regulation that addresses athletics.

The Court notes that the Department has issued a Notice of Proposed Rulemaking titled, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22860 (Apr. 13, 2023). Were this regulation to take effect, it would significantly change the legal landscape surrounding athletics.

However, as it stands, this regulation is not a final agency action. *See Farrell-Cooper Mining Co. v. U.S. Dep't of Interior*, 864 F.3d 1105, 1113 (10th Cir. 2017) ("As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process[ ]—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." (alteration in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997))). Thus, the Court does not have jurisdiction to consider this claim. *Cherry v. U.S. Dep't of Agr.*, 13 F. App'x 886, 890 (10th Cir. 2001) (unpublished) ("[T]he finality of an agency action is jurisdictional . . . .").

**B. The State will suffer irreparable harm if the injunction is denied.**

Turning to the second element, the State argues that if the Final Rule is allowed to take effect, it will suffer irreparable harm because it will be "unable to enforce its own laws without coming into conflict with the Final Rule." [Doc. No. 21 at 35]. The State also contends it will suffer from nonrecoverable compliance costs. The Department argues that the State's claim of unrecoverable compliance costs is speculative and that, "[r]egardless of whether the Rule preempts any state's laws, if the Department is prevented from administering the Rule, the Department, not Plaintiff, faces significant irreparable harm." [Doc. No. 40 at 33].

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "If the harm is not 'likely to occur before the district court rules on the merits,' there is no need for preliminary injunctive relief." *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021) (quoting *New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017)).

"'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *New Mexico Dep't of Game & Fish*, 854 F.3d at 1254 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestioningly constitutes irreparable injury." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1266 (10th Cir. 2005) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality

24

opinion)). And "[i]mposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010).

If the State is required to follow the Final Rule, it will be enjoined from effectuating laws like Okla. Stat. tit. 70, § 1-125—the statute that requires individuals to use the restrooms in public schools that match their biological sex. And as previously analyzed, the Final Rule is likely to violate students' and teachers' First Amendment rights. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." (emphasis omitted)). Lastly, the State will incur compliance costs by implementing the Final Rule's provisions, and the Court is unaware of any mechanism through which the State could recover these compliance costs should the Final Rule later be permanently enjoined, and the Department does not offer any. For these reasons, the Court concludes that this element weighs in favor of the State.

## C. The State's threatened injury outweighs the injury the Department would suffer, and a preliminary injunction is in the public interest.

Addressing the third and fourth elements which are merged, the State argues that the injuries it faces outweigh the harm to the Department. It maintains that enforcing an unlawful regulation is not in the public interest. The Department argues that if injunctive relief is granted, the federal government will be unable to prevent sex discrimination in education environments, which would have a negative effect on the public interest.

25

When evaluating the balance of equities, the Court "do[es] not reject out of hand that the administrative burdens of compliance" can constitute "a real harm." *Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016). Plus, when a law, or in this case, a regulation is "likely unconstitutional" the interest of letting it take effect does not outweigh having "constitutional rights protected." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). In the statutory context, "our 'democratically elected representatives . . . are in a better position than this Court to determine the public interest[;] . . . [t]he courts' peculiar function is to say what the law is, not to second-guess democratic determinations of the public interest.'" *Fish*, 840 F.3d at 755 (alterations in original) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir. 2003)).

The equities do not favor the Department and the public interest is not served when the law is misapplied or constitutional rights are violated. Since the current regulations have been in effect for decades, there is little harm in maintaining the status quo through the pendency of this suit. Additionally, recipients have only been given three months to comply with all the Final Rule's changes. Federal funds that go to school programs, salaries, etc. are on the line. For these reasons, neither the equities nor the public interest favors the Department.

### D. The Final Rule is preliminarily enjoined in its entirety.

Finally, the Department argues that if the Court grants the State relief, it should limit the injunction to apply only to § 106.31(a)(2) and § 106.2's definition of "hostile environment harassment." The Department contends that since the Final Rule is severable, "[t]he Court should not enjoin § 106.10, which when properly understood

26

A30

could not cause the harm that [the State] alleges." [Doc. No. 40 at 37]. The State argues the Court should preliminarily enjoin the entire Final Rule from going into effect because it has shown a substantial likelihood of success on the merits of its claim pertaining to § 106.10, and "the new definition of sex discrimination, appears to touch every substantive provision of the Rule." [Doc. No. 43 at 12 (alteration omitted)].

Based on the above analysis regarding the amended §§ 106.10, 106.2's definition of hostile environment harassment, and 106.31(a), the Court is satisfied that the State has met its burden of showing these portions of the Final Rule should be preliminarily enjoined from taking effect. The issue then becomes whether the Court should sever these provisions from the rest of the Final Rule or preliminarily enjoin the Final Rule in its entirety. *See* 89 Fed. Reg. 33474, 33848 ("The Department also confirms that each of the provisions in the final regulations is intended to operate independently of each other and that the potential invalidity of one provision should not affect the other provisions."). "[T]he problem is that these provisions, particularly the new definition of sex discrimination, appear to touch every substantive provision of the [Final Rule]." *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *3 (6th Cir. July 17, 2024).

For example, §§ 106.8(f), 106.2, 106.8, 106.11, 106.40, 106.44, 106.45, 106.46, and 106.71 all implicate the new definition of sex discrimination. "It is hard to see how all of the schools covered by Title IX could comply with this wide swath of new obligations if the Rule's definition of sex discrimination remains enjoined." *Id.* at *4. Plus, the Department does not explain how the Final Rule would even operate without § 106.10. Lastly, because of the State's showing that the Department acted in an arbitrary

and capricious manner in its enactment of the Final Rule, the Court determines

preliminarily enjoining the Final Rule in its entirety is appropriate.

## IV.   <u>CONCLUSION</u>

"The growth of the Executive Branch, which now wields vast power and touches

almost every aspect of daily life, heightens the concern that it may slip from the

Executive's control, and thus from that of the people." *Free Enter. Fund v. Pub. Co. Acct.*

*Oversight Bd.*, 561 U.S. 477, 499 (2010). Thus, when the executive branch oversteps its

constitutional or statutory bounds via agency action, the judiciary must fulfill its role and

ensure the "carefully defined limits" on each branches' power are not "eroded." *Immigr.*

*& Naturalization Serv. v. Chadha*, 462 U.S. 919, 957–58 (1983).

The Court determines, based on its analysis above, that the Motion for Preliminary

Injunction [Doc. No. 21] filed by the State of Oklahoma should be GRANTED. The

United States Department of Education and Miguel Cardona, Secretary of the U.S.

Department of Education, along with their secretaries, directors, administrators, and

employees, are preliminarily ENJOINED and RESTRAINED from implementing,

enacting, enforcing, or taking any action in any manner to enforce the Final Rule,

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving*

*Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024), which is scheduled to

take effect on August 1, 2024. The preliminary injunction is limited to the State of

Oklahoma. The Court does not require a security.[9]

IT IS SO ORDERED this 31st day of July 2024.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

---

[9] Neither party raises nor briefs the necessity of a security under Rule 65(c). In light of the relevant facts and the State's substantial likelihood of success on the merits, the Court concludes a security is not necessary.

A33